BARNABY HORTON ET AL. *v.* THOMAS J. MESKILL ET AL.

PETER D. GRACE ET AL. *v.* THOMAS J. MESKILL ET AL.
(12499)
(12500)
(12501)
(12502)

PETERS, C. J., HEALEY, SHEA, DANNEHY and SANTANIELLO, Js.

Argued October 3, 1984—decision released January 15, 1985

*Charles A. Overend,* assistant attorney general, with whom were *Robert W. Garvey,* assistant attorney general, and, on the brief, *Joseph I. Lieberman,* attorney general, and *Elena S. Boisvert,* assistant attorney general, for the appellants-cross appellees (defendant Meskill et al.).

*Austin Carey, Jr.,* with whom, on the brief, was *Paul W. Orth,* for the appellants-cross appellees (defendant town of Greenwich et al.).

*Maurice T. Fitzmaurice* and *Susan M. Cormier,* for the appellees-cross appellants (plaintiff Horton et al.).

*H. Maria Cone,* assistant corporation counsel, with whom were *Richard M. Cosgrove,* deputy corporation counsel, and, on the brief, *Richard H. Goldstein,* corporation counsel, and *Donald V. Romanik,* assistant corporation counsel, for the appellees-cross appellants (plaintiff city of Hartford et al.).

*Timothy S. Hollister* and *George C. Hastings* filed a brief as amici curiae (Connecticut Conference of Municipalities).

PETERS, C. J. These appeals are a sequel to *Horton v. Meskill,* 172 Conn. 615, 648–49, 376 A.2d 359 (1977) *(Horton I),* in which this court held unconstitutional the then existing statutory financing system for free public elementary and secondary school education in this state. Noting the difficulties of formulating appropriate orders of relief, we agreed in *Horton I* with the trial court's decision to retain jurisdiction while the General Assembly was afforded an opportunity to take responsive legislative action. Id., 650–53. The legislature in 1979 enacted, and in subsequent years amended, a plan intended to achieve equity in educational financing. Public Acts 1979, Nos. 79-128, 79-553; see General Statutes §§ 10-76f, 10-76g; §§ 10-261 through 10-263a; §§ 10-266m through 10-280a. The present litigation is a challenge by the original plaintiffs in *Horton I* and certain intervenors[1] to the constitutionality of the new plan,

---

[1] The plaintiffs are Barnaby Horton, Chloe L. Horton and Daniel J. Barnhart in cases 12499 and 12500, and Peter D. Grace and JoAnn Grace in cases 12501 and 12502. After our decision in *Horton v. Meskill,* 172 Conn. 615, 376 A.2d 359 (1977) *(Horton I),* the city of Hartford, the Hartford board of education, and Baird Quinn were permitted to intervene as additional parties plaintiff by order of *Parskey, J.* The intervention of Baird Quinn

both as originally enacted and as subsequently amended. The principal issue is whether this plan now provides the substantially equal educational opportunity for all Connecticut public school children that the Connecticut constitution requires. The trial court, *Spada, J.,* after extensive hearings, rendered judgments holding the plan constitutional in design but unconstitutional in part. The defendants have appealed and the plaintiffs have cross appealed. We find error in part on the appeal only.

The trial court examined in detail the provisions of the educational equity plan that the General Assembly enacted in 1979; Public Acts 1979, No. 79-128; and

was subsequently limited, by order of *Spada J.,* to participation in whatever remedial phase of the proceedings might be required if the trial court determined any part of the relevant legislation to be unconstitutional. No appeal has been taken from this order.

The originally named defendants in both suits are: Thomas J. Meskill, governor of the state of Connecticut, or his successors; Alden Ives, treasurer of the state of Connecticut, or his successors; Nathan G. Agostinelli, comptroller of the state of Connecticut, or his successors; Mark R. Shedd, commissioner of education for the state of Connecticut, or his successors; members of the state board of education, or their successors. In the suit brought by Barnaby Horton, members of the board of finance of the town of Canton, or their successors, and members of the board of education of the town of Canton, or their successors, were also named as defendants.

After our decision in *Horton I,* the towns of Greenwich and Darien were permitted to intervene as additional parties defendant by order of *Parskey, J.* As was the case with the intervening plaintiff Baird Quinn, the participation of these intervening defendants was limited, by order of *Spada, J.,* to the remedial phase of the proceedings. That order also has not been appealed.

Additional motions to intervene were subsequently filed. The towns of Killingly and Putnam sought to be added as parties plaintiff, and the towns of North Haven, Orange, Woodbridge, Avon, Farmington, Fairfield, and Westport sought to be added as parties defendant. In *Horton v. Meskill,* 187 Conn. 187, 191–99, 445 A.2d 579 (1982) *(Horton II),* we found no error in the decision of the trial court, *Brennan, J.,* denying these belated motions to intervene.

From the outset, these cases have been tried together and their appeals consolidated because they present identical basic facts and identical questions of law.

subsequently modified. That plan has two principal components: (1) the guaranteed tax base grant formula (GTB) and (2) the minimum expenditure requirement (MER). The GTB formula is a plan of state grants designed to provide towns with a state-guaranteed tax base for the financing of public school education.[2] It is designed to distribute equitably state aid to towns that establish their eligibility through the MER, a formula that sets the minimum acceptable level of per

---

[2] The purpose of the GTB is to achieve educational equity by means of a formula which equitably distributes state aid to education. The GTB formula determines not how much state aid will be made available but how it will be distributed. It calculates each town's eligibility for aid by means of a formula which takes into account: the town's wealth, measured by the value of its real and personal property; the town's effort, measured by the relationship between its educational expenditures and its wealth and its per capita income; and the town's need, measured by the number of its students and their educational status. The GTB formula is designed to make available to qualifying towns the guaranteed wealth base of a designated target town. Originally, the town selected as the guaranteed wealth base was the ninth wealthiest town in Connecticut. Thereafter, the legislature substituted a floating base determined by the mean plus two standard deviations, which currently guarantees to all towns the tax base of the seventh wealthiest town. This change in the calculation of the GTB has not been challenged in this litigation.

Schematically, the GTB formula can be represented as GTB = WEALTH × EFFORT × NEED, where WEALTH describes a town's ability to pay, EFFORT describes its willingness to pay, and NEED describes its student population. Each of these components is calculated according to further statistical specifications.

The calculation of the wealth component takes into account each town's equalized net grand list (ENGL), a figure computed annually by the state office of policy and management (OPM) to determine the aggregate value of each town's taxable real and personal property at 100 percent of fair market value, and each town's per capita income (PCI). These figures are compared with the per capita income of the highest per capita income town (HTPCI) to arrive at a measure of each town's wealth. WEALTH for any town ($W_t$) is thus represented as:

$$W_t = \left[ \frac{\text{ENGL}}{\text{population}} \times \frac{\text{PCI}}{\text{HTPCI}} \right]_t.$$

For GTB purposes, this figure is subtracted from a similar calculation of

pupil town expenditures.[3] The 1979 act did not commit any of the participants to immediate full implementation. Both state funding and local MER payments were to be phased-in over a five year period. In addition, property-poor towns were protected by a temporary "alternate" MER, which gave them access to GTB grants on the basis of their historical record of educational financing.[4] Finally, all towns were guaran-

the wealth of a town designated as the Guaranteed Wealth Town (GWT). The final formula for WEALTH is therefore:

$$WEALTH = \left[\frac{ENGL}{population} \times \frac{PCI}{HTPCI}\right]_{GWT} - \left[\frac{ENGL}{population} \times \frac{PCI}{HTPCI}\right]_{t.}$$

The calculation of the effort component takes into account an additional factor, the town's net current local expenditures (NCLE), which measures local education tax dollars. The formula for a town's EFFORT is thus represented as:

$$EFFORT = \left[\frac{NCLE}{ENGL \times (PCI/HTPCI)}\right]_{t}$$

The calculation of the need component looks to the number and the economic status of the town's student population, by considering the average daily membership (ADM) of town school attendance and the number of town students on aid to families with dependent children (AFDC) rolls. The formula for a town's NEED, in order to take into account the need to subsidize for AFDC children, is represented as:

NEED = ADM + 1/2 AFDC children.

[3] The minimum acceptable level of per pupil expenditure is determined by a comparison with the net current expenditure per pupil in the town where the seventy-fifth percentile student resides, when the towns are ranked from low to high according to their net current expenditures per pupil. This figure is then weighted by factoring in one-half of the number of children residing in the town who are receiving aid to families with dependent children (AFDC). The MER is intended to ensure that state equalization aid is allocated to educational expenses rather than to local tax relief. The MER mandates a specific minimum level of local expenditure. Neither the MER nor anything else in the existing statutory scheme sets a ceiling for local educational expenditures.

[4] The "alternate" MER requires low wealth towns at a minimum to maintain, during the GTB grant year, their net current expenditures per pupil of the preceding year. In addition, if the towns are also low taxing towns, they must also maintain their school tax rates of the preceding year.

teed minimum-aid grants of $250 per pupil. The court concluded that this basic plan for financing of public school education provided a constitutionally appropriate mechanism to reduce state-wide disparity in educational resources. The court also found constitutional the state programs for equitable disbursement of categorical grants for transportation, special education and school construction. See General Statutes §§ 10-266m through 10-280a; §§ 10-76f, 10-76g; and §§ 10-282 through 10-292.

The court nonetheless concluded that the salutary effect of these constitutional programs is being undermined by post-1979 destabilizing legislative action which has repeatedly postponed full implementation of the GTB program. The court thus declared unconstitutional: (1) the statute providing for continued minimum aid grants of $250 per pupil, regardless of town need; General Statutes § 10-262c (f) as amended;[5] (2) the statute requiring use of three year old data in the calculation of the guaranteed tax base; General Statutes § 10-261 (a) as amended;[6] (3) the statute postponing full funding of the guaranteed tax base to a seventh year;

[5] General Statutes § 10-262c (f) as amended provides: "EDUCATIONAL EQUALIZATION GRANTS; CALCULATIONS; EFFECT OF CHANGES IN DATA ELEMENTS. . . . (f) Except as provided in subsection (d) of this section, for the fiscal year ending June 30, 1980, and each fiscal year thereafter, no town shall receive a grant less than two hundred fifty dollars, or in the case of a town whose public school students attend a kindergarten through grade twelve regional school two hundred seventy-five dollars, for each student from such town in average daily membership for the school year three years prior to the fiscal year in which payment is to be made pursuant to this section."

[6] General Statutes § 10-261 (a) (8) as amended provides: "DEFINITIONS. (a) Whenever used in this section and sections 10-262c, 10-262e and 10-263: . . . (8) 'Equalized net grand list' for purposes of calculating the amount of grant to which any town is entitled in accordance with section 10-262c means the net grand list of such town upon which taxes were levied for the general expenses of such town three years prior to the fiscal year in which such grant is to be paid, equalized in accordance with section 10-261a . . . ."

Originally, the GTB program contemplated that the data used to calculate GTB components would be one year old data. In 1980, the legislature

General Statutes § 10-262c (c) as amended;[7] and (4) the statute permitting towns to measure their minimum expenditure requirement (MER) by an alternate standard short of full funding; General Statutes § 10-262e (c), (d), as amended.[8] In a further

amended this requirement by substituting two year old data. Public Acts 1980, No. 80-404. That amendment has not been challenged in this litigation. In 1983, the legislature made a further amendment in the data base by substituting three year old data for two year old data. Public Acts 1983, No. 83-363.

[7] General Statutes §§ 10-262c (c) provides: "EDUCATIONAL EQUALIZATION GRANTS; CALCULATIONS; EFFECT OF CHANGES IN DATA ELEMENTS. . . . (c) For purposes of this section and section 10-262e, 'full entitlement' means the amount in general state aid any town would receive pursuant to the provisions of subsections (a), (e) and (f) of this section and subsection (b) of section 10-262e, at a funding level of one hundred per cent; and for purposes of this section 'full funding' means the sum of full entitlements for all towns. The state shall appropriate for the purposes of this section:

"(1) For the fiscal year ending June 30, 1982, three hundred six million dollars;

"(2) For the fiscal year ending June 30, 1983, not less than eighty-one per cent of full funding;

"(3) For the fiscal year ending June 30, 1984, three hundred seventy-seven million seven hundred sixty-nine thousand seven hundred two dollars.

"(4) For the fiscal year ending June 30, 1985, and each fiscal year thereafter, full funding."

Public Acts 1979, No. 79-128, contemplated that the GTB program would be phased in over a five year period in order to enable the towns to plan efficiently for the additional moneys they would receive. In subsequent years, the legislature has reduced the scheduled percentage of the total amounts that were to be phased in, and has extended the phase-in schedule from five years to seven. For the 1984–1985 budget year, six years after the initiation of the GTB program, the legislature appropriated 95 percent of the scheduled amount. Special Acts 1984, No. 84-20.

The following chart documents the funding changes that have occurred:

| YEAR | FULL FUNDING | PERCENT | PHASED-IN AMT. | ACTUAL AMT. |
|------|-------------|---------|----------------|-------------|
| 1979-1980 | $393,000,000 | 56% | $220,000,000 | $219,500,000 |
| 1980-1981 | 451,000,000 | 67% | 302,000,000 | 276,200,000 |
| 1981-1982 | 473,000,000 | 78% | 369,000,000 | 306,000,000 |
| 1982-1983 | 426,000,000 | 89% | 379,000,000 | 344,800,000 |
| 1983-1984 | 443,000,000 | 100% | 443,000,000 | 377,800,000 |
| 1984-1985 | 443,000,000 | 100% | 443,000,000 | 422,400,000 |
| | | | | (proposed budget) |

[8] General Statutes § 10-262e (c) and (d), as amended, provide: "SEC. 10-262e. GRANTS TO BE EXPENDED FOR SCHOOL PURPOSES ONLY. MINI-

effort to achieve educational equity, the court concluded that the existing optional curriculum for secondary

MUM EXPENDITURE REQUIREMENT. . . . (c) Notwithstanding the provisions of subsection (b) of this section the minimum expenditure requirement for each town whose net current expenditures for each student in average daily membership for the fiscal year three years prior to the fiscal year in which payment is to be made pursuant to section 10-262c, are less than the minimum expenditure requirement determined in accordance with subsection (b) of this section shall be determined as follows:

"(1) For the fiscal year ending June 30, 1982, the per pupil expenditure for the fiscal year ending June 30, 1980, plus that percentage of the difference as determined under subdivision (1) of subsection (d) of section 10-262c between such amount expended on a per pupil basis and the minimum per pupil expenditure required under full entitlement for said fiscal year ending June 30, 1982.

"(2) For the fiscal year ending June 30, 1983, the per pupil expenditure for the fiscal year ending June 30, 1981, plus that percentage of the difference as determined under subdivision (2) of subsection (d) of section 10-262c between such amount expended on a per pupil basis and the minimum per pupil expenditure required under full entitlement for said fiscal year ending June 30, 1983.

"(3) For the fiscal year ending June 30, 1984, the minimum expenditure requirement for the fiscal year ending June 30, 1983, calculated in accordance with subdivision (2) of subsection (c) of this section, plus that percentage of the difference as determined under subdivision (3) of subsection (d) of section 10-262c, between such minimum expenditure requirement and the minimum expenditure requirement under full entitlement for said fiscal year ending June 30, 1984.

"(4) For the fiscal year ending June 30, 1985, and each fiscal year thereafter, the minimum expenditure requirement in accordance with subsection (b) of this section.

"(d) Notwithstanding the provisions of subsections (b) and (c) of this section, the minimum expenditure requirement for any fiscal year shall not apply to any town whose adjusted equalized net grand list per capita falls at or below that of the eighty-fifth wealthiest town among all towns in the state, as determined by the ranking of all towns in the state according to their adjusted equalized net grand list per capita, provided the net current expenditures for such town for such fiscal year are no less than the net current expenditures for such town for the preceding fiscal year plus an amount equal to the general state aid for said fiscal year, minus the general state aid for the preceding fiscal year and, provided further, for a town whose school tax rate is less than the school tax rate of the eighty-fifth town as determined by the ranking of all towns in the state according to their school tax rates, the school tax rate used for purposes of calculating grants pursuant to section 10-262c, for the grant year shall not be less than the school tax rate for such town used for purposes of calculating grants

school students was unconstitutional; General Statutes § 10-16b (a).[9] In each instance in which the court found the existing statutes to be constitutionally flawed, it ordered those of the defendants who had implementing responsibility to take designated appropriate action.[10] Despite these conclusions of unconstitutionality the court determined that, because the GTB program was basically constitutional, there was no need to hold a remedial stage hearing.[11]

The defendants in their appeals challenge each of the trial court's conclusions of unconstitutionality and the procedural and substantive propriety of its remedial orders. The plaintiffs in their cross appeals principally urge us to overturn the trial court's conclusion that the

---

pursuant to said section 10-262c for the fiscal year prior to the grant year."

See footnotes 3 and 4, supra, for an explanation of the MER and the alternate MER.

[9] General Statutes § 10-16b (a) provides: "PRESCRIBED COURSES OF STUDY. (a) In the public schools the program of instruction offered shall include at least the following subject matter, as taught by legally qualified teachers, the arts; career education; consumer education; health and safety; language arts, including reading, writing, grammar, speaking and spelling; mathematics; physical education; science; social studies, including, but not limited to, citizenship, economics, geography, government and history; and in addition, on at least the secondary level, one or more foreign languages and vocational education."

[10] Specifically, in its "supplemental judgments" the court (1) enjoined the defendants comptroller and treasurer from distributing minimum aid funds; (2) ordered all data used in the GTB formula to be two years old or more current, effective for the grant year 1985-86; (3) ordered the defendants comptroller and treasurer to distribute funds necessary to achieve 100 percent funding of the GTB for the 1984-85 grant year and each year thereafter; and (4) ordered the defendant state board of education and members of the board to "take appropriate action to enforce compliance with a fully implemented MER . . . for the 1984-85 grant year and thereafter for all towns."

[11] The court had earlier agreed to hold a separate hearing on remedies in the event that it concluded that any of the applicable state statutes should be held to be unconstitutional. The reason for and the effect of this commitment to have a bifurcated hearing are discussed in part II of this opinion, infra.

GTB program is basically constitutional, and to order further remedial implementation.

Because many of the issues raised by all the appeals turn on whether the GTB program is constitutional in its basic design, we will first address that question. We will then consider the trial court's curricular order and the amendments to Public Acts 1979, No. 79-128, which the court found to have an unconstitutional effect. To the extent that any legislative acts may be unconstitutional, we must determine whether the trial court should consider their remedial implications at a further hearing in which all the interested parties may have an opportunity to participate fully.

I

Assessment of the constitutionality of the GTB plan for educational equity enacted by Public Acts 1979, No. 79-128, must start with the constitutional standard that we laid down in *Horton I*. Relying on those articles of the Connecticut constitution that provide for free public education and for equal rights and equal protection,[12]

[12] Article eighth of the constitution of Connecticut provides, in relevant part: "SEC. 1. There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation. . . . SEC. 4. The fund, called the SCHOOL FUND, shall remain a perpetual fund, the interest of which shall be inviolably appropriated to the support and encouragement of the public schools throughout the state, and for the equal benefit of all the people thereof. The value and amount of said fund shall be ascertained in such manner as the general assembly may prescribe, published, and recorded in the comptroller's office; and no law shall ever be made, authorizing such fund to be diverted to any other use than the encouragement and support of public schools, among the several school societies, as justice and equity shall require."

Article first of the constitution of Connecticut provides: "SEC. 1. All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community. . . . SEC. 20. No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

we held that "in Connecticut the right to education is so basic and fundamental that any infringement of that right must be strictly scrutinized." *Horton I,* supra, 646. We recognized, however, that the fundamental right to educational equity implicated the law of equal protection in a way that was " 'in significant aspects sui generis' " and hence could not be measured "by accepted conventional tests or the application of mechanical standards." Id., 645; see also *Campbell* v. *Board of Education,* 193 Conn. 93, 104–105, 475 A.2d 289 (1984). In particular, we noted in *Horton I* that "[t]he wealth discrimination found among school districts differs materially from the usual equal protection case where a fairly defined indigent class suffers discrimination to its peculiar disadvantage. The discrimination is relative rather than absolute." *Horton I,* supra, 645. We also acknowledged the general applicability of the presumption that legislative action is constitutional unless its invalidity is established beyond a reasonable doubt. Id., 650. We therefore defined the state's constitutional obligation as a duty to allocate governmental support to education so that state funds, instead of equally benefiting all the towns by way of a flat grant, would offset the demonstrated significant disparities in the financial ability of local communities to finance local education through the local property tax. Id., 649. We held that the state was required to assure to all students in Connecticut's free public elementary and secondary schools "a substantially equal educational opportunity." Id.

We agree with the trial court that in light of *Horton I,* Public Acts 1979, No. 79-128, must be strictly scrutinized to determine whether it is constitutional. *Horton I,* supra, 646. However, the sui generis nature of litigation involving school financing legislation militates against formalistic reliance on the usual standards of the law of equal protection, in particular against the

requirement that the state must demonstrate a compelling state interest.[13] See *Dunn* v. *Blumstein,* 405 U.S. 330, 335, 342, 92 S. Ct. 995, 31 L. Ed. 2d 274 (1972); *Ryszkiewicz* v. *New Britain,* 193 Conn. 589, 597, 479 A.2d 793 (1984).[14]

[13] In the context of school financing legislation, the New Jersey Supreme Court has commented: "Mechanical approaches to the delicate problem of judicial intervention under either the equal protection or the due process clauses may only divert a court from the meritorious issue or delay consideration of it. Ultimately, a court must weigh the nature of the restraint or the denial against the apparent public justification . . . ." *Robinson* v. *Cahill,* 62 N.J. 473, 491–92, 303 A.2d 273 (1973); *Horton* v. *Meskill,* 172 Conn. 615, 646 n.14, 376 A.2d 359 (1977).

[14] In the ordinary challenge under the law of equal protection involving neither a fundamental interest nor a protected class, the burden of proving unconstitutionality remains with the plaintiff throughout. See *Campbell* v. *Board of Education,* 193 Conn. 93, 105, 475 A.2d 289 (1984); *Caldor's, Inc.* v. *Bedding Barn, Inc.,* 177 Conn. 304, 314–15, 417 A.2d 343 (1979); *Pierce* v. *Albanese,* 144 Conn. 241, 249, 129 A.2d 606, appeal dismissed, 355 U.S. 15, 78 S. Ct. 36, 2 L. Ed. 2d 21 (1957).

Since *Horton I,* courts in other jurisdictions that have analyzed the constitutionality of school financing legislation under the equal protection clauses of their state constitutions have generally determined that neither a fundamental right nor a suspect class is implicated and have therefore rejected strict scrutiny in favor of a traditional rational basis analysis. See *Lujan* v. *Colorado State Board of Education,* 649 P.2d 1005, 1018, 1022 (Colo. 1982); *McDaniel* v. *Thomas,* 248 Ga. 632, 647, 285 S.E.2d 156 (1981); *Hornbeck* v. *Somerset County Board of Education,* 295 Md. 597, 650–53, 458 A.2d 758 (1983); *Board of Education, Levittown Union Free School District and Board of Education, City School District, Rochester* v. *Nyquist,* 57 N.Y.2d 27, 42–44, 439 N.E.2d 359, 453 N.Y.S.2d 643 (1982), appeal dismissed, 459 U.S. 1138, 1139, 103 S. Ct. 775, 74 L. Ed. 2d 986 (1983); *Board of Education* v. *Walter,* 58 Ohio St. 2d 368, 374–76, 390 N.E.2d 813 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 665, 62 L. Ed. 2d 644 (1980); see also *DuPree* v. *Alma School District No. 30,* 279 Ark. 340, 345–46, 651 S.W.2d 90 (1983) (no need to decide whether education is fundamental right because system is unconstitutional under any standard including rational basis); but see *State ex rel. Board of Education* v. *Rockefeller,* 281 S.E.2d 131, 135 (W. Va. 1981); *Pauley* v. *Kelly,* 255 S.E.2d 859, 878 (W. Va. 1979); *Washakie County School District No. One* v. *Herschler,* 606 P.2d 310, 333 (Wyo.), cert. denied sub nom. *Hot Springs County School District Number One* v. *Washakie County School District Number One,* 449 U.S. 824, 101 S. Ct. 86, 66 L. Ed. 2d 28 (1980).

The out-of-state cases using the rational basis test have ordinarily either expressly or impliedly accorded the legislation the traditional presumption

In searching for an appropriate and workable standard that is consistent with the mandate of *Horton I,* we may fruitfully borrow a framework of analysis that federal courts have devised to assess the constitutionality of state legislative apportionment plans. The Supreme Court of the United States has acknowledged that the equal protection clause, in that context, although it requires "strict scrutiny [of] classifications bearing on the right to vote in state elections"; *Plyler* v. *Doe,* 457 U.S. 202, 233, 102 S. Ct. 2382, 72 L. Ed. 2d 786, reh. denied, 458 U.S. 1131, 103 S. Ct. 14, 73 L. Ed. 2d 1401 (1982) (Blackmun, J., concurring); see also id., 217 n.15 (opinion of the court); does not compel "the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest." Id., 217. The court has instead developed what is functionally a three-part test to determine whether a state has fulfilled its obligation under the equal protection clause to "make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Reynolds* v. *Sims,* 377 U.S. 533, 577, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964); *Mahan* v. *Howell,* 410 U.S. 315, 324–25, 93 S. Ct. 979, 35 L. Ed. 2d 320, modified, 411 U.S. 922, 93 S. Ct. 1475, 36 L. Ed. 2d 316 (1973); *Brown* v. *Thomson,* 462 U.S. 835, 842, 103 S. Ct. 2690, 77 L. Ed. 2d 214 (1983). First, a plaintiff must establish a prima facie case of discrimination by demonstrating that a state's plan results in more than " 'minor deviations from mathematical equality among state legislative districts . . . .' " *Brown* v. *Thomson,* supra, 842. If the plaintiff proves that the disparities are not de minimis, the burden then shifts to the state to justify them. The state must show that its plan

of constitutionality. Accordingly they have also assigned the burden of persuasion in its totality to the plaintiffs. E.g., *Lujan* v. *Colorado State Board of Education,* supra, 1022; *Hornbeck* v. *Somerset County Board of Education,* supra, 642; *Board of Education* v. *Walter,* supra, 376.

"may reasonably be said to advance [a] rational state policy . . . ." *Brown* v. *Thomson,* supra, 843, quoting *Mahan* v. *Howell,* supra, 328. Its justification must, of course, be " 'free from any taint of arbitrariness or discrimination.' " (Citation omitted.) *Mahan* v. *Howell,* supra, 325; see *Brown* v. *Thomson,* supra, 852 (Brennan, J., dissenting). A showing that the state's reasons are legitimate and are in fact furthered by its plan, however, does not end the inquiry. Under the third part of the test, a plan will not withstand scrutiny if the resulting disparities are still so great as to be unconstitutional. See *Brown* v. *Thomson,* supra, 844–45; *Mahan* v. *Howell,* supra, 329.

We conclude that, like legislative apportionment plans, educational financing legislation must be strictly scrutinized using a three-step process. First, the plaintiffs must make a prima facie showing that disparities in educational expenditures are more than de minimis in that the disparities continue to jeopardize the plaintiffs' fundamental right to education. If they make that showing, the burden then shifts to the state to justify these disparities as incident to the advancement of a legitimate state policy. If the state's justification is acceptable, the state must further demonstrate that the continuing disparities are nevertheless not so great as to be unconstitutional. In other words, to satisfy the mandate of *Horton I,* a school financing plan must, as a whole, further the policy of providing significant equalizing state support to local education. *Horton I,* supra, 649. However, no such plan will be constitutional if the remaining level of disparity continues "to emasculate the goal of substantial equality." *Mahan* v. *Howell,* supra, 326.

The trial court came to its ultimate conclusion that Public Acts 1979, No. 79-128, was constitutional by a route that differs from the three-part test which we

have decided to adopt. Nevertheless, we agree with its holding on this issue.

It is conceded by all parties that the evidence before the trial court demonstrates continued significant disparities in the funds that local communities spend on basic public education.[15] The plaintiffs' evidence therefore suffices to shift to the state the burden of justification for the statute.

We next consider whether the state has met this burden. The trial court reasoned that the legislation enacted in 1979 was a constitutionally acceptable response to the problem of disparate local educational expenditures. The court determined that, if adequately funded, the GTB program would provide sufficient overall expenditures for public school education, that its five-year phase-in assured an efficient use of educational resources, and that its design would provide equity in the distribution of educational funds and a proper balance between state and local contributions

---

[15] The trial court relied on an exhibit showing:

"Net Current Expenditures Per Pupil (Unweighted) 1973-74 to 1983-84

(N=169)

| Range in Per Pupil Expenditures | 1973 -74 | 1974 -75 | 1975 -76 | 1976 -77 | 1977 -78 | 1978 -79 | 1979 -80 | 1980 -81 | 1981 -82 | 1982 -83 | 1983 -84 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | unaudited, as submitted by LEAs (N=155) | | |
| High Town | $1656 | $1834 | $2059 | $2225 | $2488 | $2746 | $3029 | $3359 | $3761 | $4367 | $4867 |
| 95th Percentile Town | 1503 | 1645 | 1716 | 1906 | 2085 | 2322 | 2514 | 2908 | 3298 | 3614 | 4082 |
| Mean Town | 1070 | 1199 | 1292 | 1412 | 1570 | 1745 | 1973 | 2280 | 2550 | 2832 | 3075 |
| 5th Percentile Town | 804 | 913 | 966 | 1019 | 1149 | 1280 | 1498 | 1722 | 1918 | 2123 | 2370 |
| Low Town | 711 | 779 | 858 | 930 | 1014 | 1180 | 1365 | 1573 | 1760 | 1927 | 2035 |

Expenditure Disparity

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 95:5 Ratio | 1.87 | 1.80 | 1.78 | 1.87 | 1.81 | 1.81 | 1.68 | 1.69 | 1.72 | 1.70 | 1.70 |
| High to Low Ratio | 2.33 | 2.35 | 2.40 | 2.39 | 2.45 | 2.33 | 2.22 | 2.14 | 2.14 | 2.27 | 2.39 |
| McLoone Index | .881 | .884 | .886 | .879 | .873 | .883 | .882 | .885 | 880 | .886 | .886 |
| Coefficient of Variation | 0.18 | 0.17 | 0.17 | 0.17 | 0.17 | 0.17 | 0.16 | 0.17 | 0.17 | 0.17 | 0.17 |

95:5 Ratio: 95th percentile town divided by 5th percentile town

High to Low Ratio: High town divided by low town.

McLoone Index: A measure of the variation of NCEPs below the median, the closer the index is to one the greater the equity.

Coefficient of Variation: A measure of the variation of NCEPs around the mean, the closer the coefficient is to zero the greater the equity."

thereto. In addition, the court found that the program retained a salutary role for local choice by guaranteeing minimum funds without imposing a ceiling on what a town might elect to spend for public education. Finally the court noted that a number of factors beyond direct state control had tended, in the recent past, to increase rather than diminish discrepancies in educational spending. The trial court identified several such factors: public school enrollment has decreased more rapidly in the wealthier than in the poorer towns; property values have increased more rapidly in the wealthier than in the poorer towns; and recent high rates of inflation have eroded the benefits of the GTB grants to the poorer towns. In light of all of these circumstances, Public Acts 1979, No. 79-128, was a reasonable response to the policy dictates of *Horton I.*

In assessing the adequacy of the challenged state legislation under the third step of the test, we can rely on the trial court's finding that the effect of the legislation was to narrow significantly disparities in the ability of local communities to finance local education[16] and to increase significantly the state's share of overall educational costs for public schools.[17] It was, therefore, reasonable for the trial court to conclude that the remaining disparities did not undermine the basic policy of equalizing state support for education.

In agreeing with the trial court's judgment regarding the constitutionality of the legislation as originally enacted, we also concur with the court's judgment on the plaintiffs' cross appeal. The plaintiffs sought to

---

[16] Disparities in town expenditures for education are appropriately measured by reference to the 95:5 ratio which compares the expenditures of the ninety-fifth percentile town with those of the fifth percentile town when the towns are ranked by wealth. The percentage gap in the 95:5 ratio has closed from 86.9 percent in 1973-1974 to 70.1 percent in 1983-1984.

[17] From 1978 to 1984, the state's share of local educational costs increased from 29.8 percent to 42.9 percent, while the local communities' share decreased from 63.3 percent to 49.8 percent.

impose state funding of 50 percent of overall educational expenditures as the only constitutionally adequate response to educational disparities. The trial court carefully considered that proposal and correctly decided that assigning a fixed share of expenditures to the state did not provide a sound basis for assuring a proper distribution of responsibility or of funding for substantially equal educational opportunities.

We also agree with the conclusion of the trial court that the state plan for the distribution of categorical grants is constitutional. The court found that the categorical grant programs had not been shown to impinge upon the fundamental right to a substantially equal education. The plaintiffs, who raise this issue in their cross appeals, have not pointed to any evidentiary basis in the record to contradict this finding by the trial court. They therefore have failed to establish the necessary predicate for their claim that impairment of their fundamental rights in this regard required current funding of special education grants.

## II

We turn now to the appeals from the decision of the trial court declaring unconstitutional certain post-1979 statutes implementing the present state program for educational equity. The court's judgments of unconstitutionality relate in the main to statutes that have an impact upon the continued disparities in local educational expenditures, but the court also found unconstitutional the statute which allowed local communities the option to determine the curriculum for secondary school education. General Statutes § 10-16b (a).[18] We will consider these matters in reverse order.

The court ordered, on constitutional grounds, that locally determined high school curricula be replaced by

---

[18] For text of General Statutes § 10-16b (a), see footnote 9, supra.

a state-defined core curriculum. The defendants claim that the court's orders are invalid because the constitutionality of § 10-16b (a) was never questioned in the plaintiffs' complaints. We need not decide whether this claim is well taken because events have overtaken the court's orders. The court specifically foresaw such a possibility when its judgments stated that they should "not be construed to prohibit changes to the mandated core curriculum by legislative amendment." The General Assembly has now enacted a core curriculum requirement for high school graduation. Public Acts 1984, No. 84-297.[19] Since there is no longer any basis

[19] Public Acts 1984, No. 84-297, provides: "PUBLIC ACT NO. 84-297. AN ACT CONCERNING HIGH SCHOOL GRADUATION REQUIREMENTS. Section 1. Public act 83-282 is repealed and the following is substituted in lieu thereof: (a) [Commencing with the class graduating in 1987, and for each graduating class thereafter, no] NO local or regional board of education shall permit any student OF A CLASS GRADUATING IN 1987 to graduate from high school or grant a diploma to any SUCH student who has not satisfactorily completed a minimum of eighteen credits. COMMENCING WITH A CLASS GRADUATING IN 1988, AND FOR EACH GRADUATING CLASS THEREAFTER, NO LOCAL OR REGIONAL BOARD OF EDUCATION SHALL PERMIT ANY STUDENT TO GRADUATE FROM HIGH SCHOOL OR GRANT A DIPLOMA TO ANY STUDENT WHO HAS NOT SATISFACTORILY COMPLETED A MINIMUM OF TWENTY CREDITS, NOT FEWER THAN FOUR OF WHICH SHALL BE IN ENGLISH, NOT FEWER THAN THREE IN MATHEMATICS, NOT FEWER THAN THREE IN SOCIAL STUDIES, NOT FEWER THAN TWO IN SCIENCE, NOT FEWER THAN ONE IN THE ARTS OR VOCATIONAL EDUCATION AND NOT FEWER THAN ONE IN PHYSICAL EDUCATION. ANY STUDENT WHO PRESENTS A CERTIFICATE FROM A PHYSICIAN STATING THAT IN THE OPINION OF THE PHYSICIAN, PARTICIPATION IN PHYSICAL EDUCATION IS MEDICALLY CONTRAINDICATED BECAUSE OF THE PHYSICAL CONDITION OF SUCH STUDENT, SHALL BE EXCUSED FROM THE PHYSICAL EDUCATION REQUIREMENT, PROVIDED THE CREDIT FOR PHYSICAL EDUCATION MAY BE FULFILLED BY AN ELECTIVE. DETERMINATION OF ELIGIBLE CREDITS SHALL BE AT THE DISCRETION OF THE LOCAL OR REGIONAL BOARD OF EDUCATION, PROVIDED THE PRIMARY FOCUS OF THE CURRICULUM OF ELIGIBLE CREDITS CORRESPONDS DIRECTLY TO THE SUBJECT MATTER OF THE SPECIFIED COURSE REQUIREMENTS. [This requirement] THESE REQUIREMENTS shall apply to any student requiring special education pursuant to section 10-76a of the general statutes, except when the planning and placement team for such student determines the requirement not to be appropriate. For purposes of this section, a credit shall [be deemed to be] CONSIST OF not less than THE EQUIVALENT OF a forty-minute class period

for affording judicial relief on these orders, they have become moot and therefore we need not determine their validity. *Connecticut Foundry Co.* v. *International Ladies Garment Workers Union,* 177 Conn. 17, 19, 411 A.2d 1 (1979); *Reynolds* v. *Vroom,* 130 Conn. 512, 515, 36 A.2d 22 (1944).

The court's principal determinations of unconstitutionality relate to educational financing statutes enacted subsequent to the 1979 establishment of the GTB program which the court concluded had impermissibly undermined the capacity of that program to diminish continued disparities in educational expenditures. The court pointed to a variety of statutory enactments that served to perpetuate undesirable disparities. State funding has been phased in at a lower level and a slower rate than originally contemplated, so that for 1984–1985, funding has been provided at a 95 percent rather than a 100 percent level, and full funding postponed to a seventh year.[20] Towns have been permitted to delay in moving to full MER contributions.[21] The legislature has also amended the program to substitute three year old data for two year old data in the calculation of the relevant grants.[22] The court determined that, although access to educational opportunities had been improved by the additional state and local educational funds generated by the GTB program, the

for each school day of a school year. [, or the equivalent thereof.] Only courses taken in grades nine through twelve, inclusive, shall satisfy this graduation requirement. The state board of education shall assist local and regional boards of education in meeting the requirements of this section.

"(b) The state board of education shall report on the status of graduation requirements in the state's public high schools and on its recommendations regarding such requirements to the joint standing committee of the general assembly having cognizance of matters relating to education no later than January 1, 1985, and every five years thereafter.

"Sec. 2. This act shall take effect July 1, 1984."

[20] For the text of the relevant statutes, see footnote 7, supra.

[21] For the text of the relevant statutes, see footnote 8, supra.

[22] For the text of the relevant statutes, see footnote 6, supra.

post-1979 amendments resulted in continued financial disparities which, in the absence of a compelling state interest, unconstitutionally interfered with the plaintiffs' fundamental constitutional rights.

Relying on statistical evidence of continued significant disparities in local educational expenditures,[23] the court declared that the gap between the educational resources of the property-rich towns and the property-poor towns must be narrowed by elimination of: (1) minimum aid grants, General Statutes § 10-262c (f) as amended by Public Acts, Spec. Sess., June, 1983, No. 4; (2) deferral of full GTB financing, General Statutes § 10-262c (c) as amended by Public Acts, Spec. Sess., June, 1983, No. 4; (3) alternate MER requirements, General Statutes § 10-262e (d) as amended by Public Acts 1983, No. 83-363, and Public Acts, Spec. Sess., June, 1983, No. 4; and (4) three year old data in the calculation of GTB grants, General Statutes § 10-261 (a) as amended by Public Acts 1983, No. 83-363, and Public Acts, Spec. Sess., June, 1983, No. 4. Accordingly, the court ordered, by way of remedy, that various designated governmental officials disburse or collect funds in order to implement the court's conclusions of unconstitutionality.[24]

We agree with the trial court that the plaintiffs established a factual foundation for the court's conclusion that continued disparities in educational financing required strict scrutiny of the state statutes that have an impact on educational equity. We disagree, however, with the substantive standard by which the trial court tested the validity of the statutes and with the procedural failure of the trial court to afford all the interested parties an opportunity to be heard on the remedial implications of the court's decisions on unconstitutionality.

[23] See footnote 15, supra.
[24] See footnote 10, supra.

It is clear from the trial court's memorandum of decision that the court found the statutes before it to be unconstitutional because the defendants had failed to prove that the statutes met a compelling state interest. As we have already indicated in this opinion, we believe that the proper test requires the state to prove that the amendments reasonably advanced a rational state policy and that they did not result in an unconstitutionally large disparity.[25] For this reason, we must remand this case, as to the amendments only, for further proceedings in the trial court in accordance with the substantive standard which we have now articulated.

It is also clear that the trial court's judgment is procedurally flawed. Just as our decision in *Horton I* set the substantive parameters for assessment of the constitutionality of the present plan for state financing of public secondary school education, so our decision in *Horton* v. *Meskill,* 187 Conn. 187, 445 A.2d 579 (1982) (*Horton II*) set the procedural stage. There we discussed the role of the various municipalities who have an obvious interest in the outcome of this litigation. We noted first that "the rights at stake are the *students'* constitutional rights to equal protection and free public education. . . . The state's duty to provide

---

[25] In considering a congressional reapportionment plan, the United States Supreme Court discussed the state's burden of proof. Its comments are equally applicable to the situation before us. "The State must, however, show with some specificity that a particular objective required the specific deviations in its plan, rather than simply relying on general assertions. The showing required to justify . . . deviations is flexible, depending on the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate . . . equality more closely. By necessity, whether deviations are justified requires case-by-case attention to these factors." *Karcher* v. *Daggett,* 462 U.S. 725, 741, 103 S. Ct. 2653, 77 L. Ed. 2d 133 (1983); see also *Brown* v. *Thomson,* 462 U.S. 835, 844–46 and 848 n.1, 103 S. Ct. 2690, 77 L. Ed. 2d 214 (1983) (O'Connor, J., concurring).

education is owed to the students, not the municipalities." (Emphasis in original.) Id., 195. We referred also to our established case law that generally forbids municipalities, because they are creations of the state, from challenging the constitutionality of the state's laws. Id., 196. We concluded that the interests of the municipalities could reasonably be protected by having a bifurcated trial. Although the municipalities were precluded "from participating on either side in the court's consideration of the constitutionality of the present legislative financing system," they could play a role in proceedings "to aid the court in determining appropriate relief in the event the legislative financing system is found to be unconstitutional." Id., 198. Guided by this holding, the trial court agreed to hold a bifurcated hearing with respect to all the interested parties. The court stated that it would first determine whether the current legislation was constitutional. Thereafter, in the event that the legislation were found to be unconstitutional, it would determine, after a separate remedial hearing, what relief should be ordered to remedy the situation.

In light of this commitment to full participation by all of the parties in the remedial judgments that would ensue if the statutes at issue were found to be constitutionally defective, further trial court consideration of all aspects of their validity is desirable. Our decision in *Horton I* gave to the trial court, and to the litigants at trial, only limited guidance about the precise constitutional test by which to measure access to substantially equal educational opportunities. It may well be that additional hearings will help to sharpen the difficult substantive judgments that will have to be made. In litigation that raises constitutional issues that have systemic implications for the operation of government, it is appropriate for a trial court to pursue a joint consideration of right and remedy. See *Gaines* v. *Manson,*

194 Conn. 510, 519–20, 481 A.2d 1084 (1984). Postponement of final adjudication on the merits is particularly appropriate when the relief that the plaintiffs seek is a mandatory or a negative injunction. As in cases in which courts are asked to fashion an equitable remedy for racial discrimination in education, where fundamental rights are similarly at issue, equitable principles require a balance of three factors: the nature and the scope of the constitutional violation, the plaintiff's right to meaningful relief, and the interests of state and local authorities in managing their own affairs. *Milliken* v. *Bradley,* 433 U.S. 267, 279–81, 97 S. Ct. 2749, 53 L. Ed. 2d 745 (1977). Our own cases have similarly acknowledged that a court, in the exercise of its discretion to frame injunctive relief, must "balance the competing interests of the parties" to assure that the relief it grants is " 'compatible with the equities of the case' "; *Dukes* v. *Durante,* 192 Conn. 207, 225, 471 A.2d 1368 (1984); and takes account of the possibility of "embarrassment to the operations of government." *CEUI* v. *CSEA,* 183 Conn. 235, 248–49, 439 A.2d 321 (1981). Remand is therefore required to determine whether the challenged statutes are unconstitutional and to frame whatever orders for equitable relief may be appropriate.

There is error on the appeals; the judgments of the trial court are set aside and the cases are remanded for further proceedings in accordance with this opinion; there is no error on the cross appeals.

In this opinion the other judges concurred.