[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The Decision of the Connecticut Supreme Court
On July 9, 1996, the Connecticut Supreme Court issued its decision in this case, Sheff v. O'Neill, 238 Conn. 1,678 A.2d 1267 (1996), in which it held that students in the Hartford public schools were racially, ethnically and economically isolated and that, as a result, Hartford public school students had not been provided a substantially equal educational opportunity under the state constitution, article eighth, § 1, and article first, §§ 1 and 20. 238 Conn. at 37-38, 47.
The Court clearly recognized that the State had not intentionally segregated racial and ethnic minorities in the Hartford public school system. 238 Conn. at 10. But it also recognized that the State had created local school districts, which it identified as the most important factor contributing to the concentration of racial and ethnic minorities in Hartford:
 Although intended to improve the quality of education and not racially or ethnically motivated, the districting statute that the legislature enacted in 1909, now codified at § 10-240, is the single most important factor contributing to the present concentration of racial and ethnic minorities in the Hartford public school system. The districting statute and the resultant school district boundaries have remained virtually unchanged since 1909. The districting statute is of critical importance because it establishes town boundaries as the dividing line between all school districts in the state.
238 Conn. at 11. CT Page 2901
Although the Court noted that "according to the findings of the trial court, poverty, not race or ethnicity, is the principal causal factor in the lower educational achievement of Hartford students," 238 Conn. at 11, its holding implicitly recognized a strong causal relationship between racial and ethnic isolation and lower educational achievement.[1]
The Court further recognized that:
 The General Assembly has enacted no legislation that was intended to cause either de jure or de facto segregation. It enacted the districting statute, not to impose or to foster racial or ethnic isolation, but to improve educational quality for all Connecticut school children by increasing state involvement in all aspects of public elementary and secondary education. Moreover, the districting scheme presently furthers the legitimate nonracial interests of permitting considerable local control and accountability in educational matters.
238 Conn. at 40-41.
The Court's decision also contains the following language concerning the importance of remedying racial, ethnic and economic segregation in the schools:
"[S]chools are an important socializing institution, imparting those shared values through which social order and stability are maintained." Plyler v. Doe, 457 U.S. 202, 222 n. 20, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). Schools bear central responsibility for "inculcating [the] fundamental values necessary to the maintenance of a democratic political system. . . ." Ambach v. Norwick, 441 U.S. 68, 77, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979). When children attend racially and ethnically isolated schools, these "share values" are jeopardized: "If children of different races and economic and social groups have no opportunity to know each other and to live together in school, they cannot be expected to gain the understanding and mutual respect necessary for the cohesion of our society." (Internal quotation marks omitted.) Jenkins v. Township of Morris School District, 58 N.J. 483, 498, 279 A.2d 619 (1971). "[T]he elimination of racial isolation in the schools promotes the attainment of equal educational opportunity and is beneficial to all students, both black CT Page 2902 and white." Lee v. Nyquist, 318 F. Sup. 710, 714 (W.D.N Y 1970), aff'd without opinion, 402 U.S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105 (1971).
238 Conn. at 34.
The Court did not order judicial intervention to remedy the racial, ethnic and economic isolation existing in the Hartford Public Schools. Instead, the Court directed the trial court to issue a declaratory judgment and to retain jurisdiction in order to give the Legislature the opportunity to act. Specifically the Court directed "the legislature and the executive branch to put the search for appropriate remedial measures at the top of their respective agendas." Id. at 46.
The Education Improvement Panel
The State's response to the Supreme Court's decision was swift. On July 25, 1996 Governor John Rowland issued Executive Order No. 10, creating the Education Improvement Panel ("EIP"), which was charged to "explore, identify and report on a broad range of options for reducing racial isolation in our state's public schools, improving teaching and learning, enhancing a sense of community and encouraging parental involvement." Twenty-one Connecticut citizens, diverse in race, occupation and background, were selected by the Governor and the Legislative leadership and appointed to serve on this panel which was chaired by Theodore S. Sergi, the State's Commissioner of Education. Members included the presidents of the state NAACP and the New England Health Care Employees Union, a college professor, education professionals from both the local and state levels, and a number of elected officials from all levels of government. Seven members of the Panel were either African American or Latino, and three had children or close relatives in the Hartford Public Schools.
The group process used by the Panel in its discussions and deliberations reflected an extraordinary degree of cooperation and consensus building. Although the Executive Order creating the Panel spoke of avoiding "forced bussing," Panel members discussed at length whether that option should be "off the table." Ultimately, even that controversial topic was fully explored. The Panel gradually narrowed a list of hundreds of ideas to fifteen recommendations which were supported by a majority of Panel members. CT Page 2903
To assist them in formulating their recommendations, the Panel requested input from many outside sources. Experts from around the country, as well as other interested parties, including the plaintiffs and Capitol Region Education Council's John Allison, addressed the Panel. Each of the Panel's final recommendations had support of a majority of the Panel members. However, Panelists were allowed to voice separate or further opinions, and the final report includes numerous "minority" reports or statements.
When it was issued on January 22, 1997, the EIP final report was delivered to the Education Committee of the General Assembly, and the recommendations in the report formed the basis of legislation that was subsequently enacted. The recommendations of the Panel in the final report included a significant expansion of public school choice, measures to increase public school accountability and parental involvement, strengthening of existing programs, and improving adult education.
Within five months of receiving the final report of the Education Improvement Panel, the Connecticut Legislature had passed Public Act 97-290, entitled "An Act Enhancing Educational Choices and Opportunities." This legislation was aimed at reducing racial, ethnic and economic isolation, as well as improving the quality of education throughout the State — with an emphasis on improving urban education.
The first section of Public Act 97-290 amended Connecticut General Statutes § 10-4a, the statute which defines the "educational interests of the state," to include the reduction of "racial, ethnic and economic isolation," and to impose a duty on each school district to "provide educational opportunities for its students to interact with students and teachers from other racial, ethnic and economic backgrounds. . . ."[2] The failure of local districts to carry out one or all of the "educational interests of the State," can, as discussed below, result in financial and other sanctions, including the loss of state educational funding. Moreover, the State Department of Education can initiate litigation to enforce the state's educational interests.
Section two of Public Act 97-290 provided that school boards could reduce racial, ethnic and economic isolation by using programs or methods such as: CT Page 2904
 (1) Interdistrict magnet school programs; (2) charter schools; (3) interdistrict after-school, Saturday and summer programs and sister-school projects; (4) intradistrict and interdistrict public school choice programs; (5) interdistrict school building projects; (6) interdistrict program collaboratives for students and staff; (7) minority staff recruitment; (8) distance learning through the use of technology; and (9) any other experience that increases awareness of the diversity of individuals and cultures.
Interdistrict Cooperative Programs
Interdistrict cooperative programs are school sponsored programs in which students from different school districts participate together in a diverse array of educational experiences. These programs, funded largely by the State, bring urban and suburban students together in the context of quality educational experiences. Educators who were called as witnesses by both the plaintiffs and the defendants agreed that interdistrict programs were beneficial. For example, Raul Montanez Pietre, principal of the Mary Hooker Elementary School in Hartford, called as a witness by the plaintiffs, testified that the interdistrict program between children at the Mary Hooker School and the Plantsville elementary school was highly successful in breaking down racial and economic barriers between the children. He testified the children learned and gained educational benefit from interdistrict programs despite the fact that they were not full time programs.
In order to receive State funding, interdistrict programs must promote diversity as well as academic improvement. The State Department of Education operates a competitive process in which local school districts or Regional Educational Service Centers submit written proposals for such programs. The review and approval process rewards programs that maximize the number and duration of face-to-face encounters between the students from different backgrounds.
The nature and duration of Interdistrict Cooperative Programs varies considerably. Some such programs are five week residential programs, where the participants live together and conduct in depth studies of particular topics like art and literature. Others are "Sister School" programs with minor State stipends CT Page 2905 that allow for students from urban and suburban schools to visit museums together or conduct other classroom exchanges. In order to fund a greater number of programs, the State typically funds the interdistrict cooperative programs at 70-90% of the funds requested. At this level of funding, the applicants tend to make up any gap in funding through local monies or private donations. After July, 2000, no program can receive approval unless it establishes that no more than 80% of the student participants will come from any one school district. About half of these programs are sponsored by Regional Educational Service Centers and half by local school districts.
In school year 1997-98, some 81,502 students participated in interdistrict cooperative programs, and 100,000 students, nearly 20% of all public school children in the State, are expected to participate in 1998-99.
In addition to Mr. Montanez, Dr. John Allison, a former director of the Capitol Region Education Council, called as a witness by the plaintiffs, indicated that the programs are worthwhile, and that they reduce isolation and provide educational experiences. James Thompson, principal at Simpson-Waverly Elementary School in Hartford, another plaintiffs'witness, also described interdistrict cooperative grant activities in which his students had participated. Various witnesses, including several of plaintiffs' experts, agreed that when students from different backgrounds come together for constructive activity, that is in itself an educational experience.
Interdistrict Magnet Schools
Interdistrict magnet schools are created by two or more districts combining their ideas, skills and resources to create a new school centered around a unique or unusual theme, specifically designed to foster both excellence in academics and the reduction of racial, ethnic or economic isolation. Interdistrict Magnet schools existed prior to the Supreme Court's decision. However, since by definition a magnet school is made up of students from different districts, both the State and the plaintiffs have recognized the magnet school as an excellent method of reducing racial, ethnic and economic isolation.
Overall, State spending on magnet schools will be $17.5 million dollars for fiscal year 1998-99, representing an increase CT Page 2906 in excess of $7 million over the spending level for 1997-98. Both the number of magnet schools and their enrollments have shown remarkable growth, which, based on the known magnet school planning projects and planned magnet school expansions, are expected to continue into the future. Approximately twenty-seven percent of the interdistrict magnet schools being planned around the state involve participation by the Hartford Public Schools.
Like interdistrict cooperative programs, magnet schools grow out of the ideas, enthusiasm and commitment of the local districts that join forces to create them. These people are in the best position to assess what concepts will gain support and thrive as new schools. Magnet schools in urban areas which have unique educational programs can and have in this state attracted suburban students.
If a magnet school is housed in a new building, the State provides 100% funding for the construction of the building. In order to receive the State construction money the districts must commit to the new school for at least a twenty years. Those working on the development of a new magnet school can receive State funding for the planning process in the form of an interdistrict cooperative grant specifically earmarked for the planning of a magnet school. However, not all magnet schools currently in operation or proposed have used this State funding source for planning.
The State Department of Education has a division which includes employees who meet regularly with those planning new interdistrict magnet schools. They provide guidance and assistance in the development process, including supplying a "nuts and bolts" set of guidelines for the process. The founders of a proposed magnet school must submit a detailed "operations plan" which is carefully scrutinized. In particular, the State Department of Education looks for a strong and appropriate governance structure composed of at least three districts, suitable staffing patterns, facilities, financial plans and, most importantly, an outstanding program that will attract a diverse student body. Once the proposed magnet school obtains approval of its operations plan, the founders must also obtain approval of their facilities plan from the State personnel who provide approval and funding for school facilities. They can then compete for State magnet school operational dollars.
The structure for the operational funding of interdistrict CT Page 2907 magnet schools is designed to encourage racial and ethnic diversity. Magnet schools are rewarded through financial incentives for accomplishing the greatest diversity in the racial and ethnic makeup of their student bodies. State funds for operating an interdistrict magnet school are based on per pupil payments determined as a percentage of the State's "foundation" level, currently set at $5775 per pupil. If the districts participating in the magnet school send no more than 30% of the students to the school, then the magnet school receives 90% of the foundation level for each pupil from each such district. As the percentage from the sending district rises above the 30% threshold, the operational reimbursement decreases correspondingly. This funding formula provides a strong financial incentive to the founders of magnet schools to seek to have three or more districts involved in the magnet school, with each contributing less than 30% of the students. Since the school must show it will reduce racial and/or ethnic isolation, this funding formula ensures participation of both urban and suburban districts in appropriate proportions while avoiding the pitfalls and possible legal challenges of having raced based quotas.[3]
As with the interdistrict cooperative grants, by July 2000, the law will prohibit more than 80% of the students in a magnet school from coming from any one district.
The State has provided a further financial incentive for local districts to participate in magnet schools. The sending districts are permitted to count the students they are sending to the magnet school in their student counts for Education Cost Sharing purposes. For example, if West Hartford sent 7 children to the Montessori Magnet school in Hartford in 1998, it would receive the same amount in Education Cost Sharing monies from the State as it would if the students remained in West Hartford schools. Obviously, under this formula the sending district could secure substantial State funds in excess of those normally received for education. Transportation funding is also available for students who do not live in the district in which the school is located at the level of $1200 per student.
State Department of Education personnel visit each magnet school twice per year to review curricula and meet with parents, teachers and school committees in order to ensure that the interdistrict magnet schools are fulfilling their mission of providing quality education while reducing isolation. The State Department of Education also must file annual interim and final reports. Magnet schools are required to report their race and CT Page 2908 ethnicity data like any other school. If an interdistrict magnet school does not meet its diversity goals, the State Department of Education provides technical assistance and additional grant monies addressed to recruiting practices and plans, giving the school a limited period in which to correct the problem. Such assistance combined with the State's ability to withdraw funding from a magnet school which is not achieving its diversity goals has been successfully used to obtain compliance by existing magnet schools in Waterbury and New Haven.
Charter Schools
Like magnet schools, charter schools are conceived and implemented by local educators and parents. Charter schools arise from an entrepreneurial approach to providing education and use a unique, autonomous governance structure. They can be created quickly, but if they fail to meet their educational mission, they can also be dismantled quickly through the State's revocation or nonrenewal of their charters. Typically, they are small in size, with smaller class sizes, and the stakeholders and founder of the school take on full accountability and responsibility for the school. There are two kinds of charter schools in Connecticut, State and local charter schools. Both kinds of charter schools receive their charter directly from the State Board of Education. The important difference is that local school districts must first endorse local charter schools and local districts fund the operation of the local charter schools. Charter schools generally center around a particular theme and adopt innovative approaches to education. Charter schools can provide more educational options, particularly for urban students. Several existing charter schools, for example, address the needs of"at risk" students who have not succeeded in regular public schools or offer a more rigorous, disciplined approach to learning.
The establishment of a charter school is a competitive process. Prospective founders of such a school must respond to State Request for Proposals which require spelling out in detail the parameters of the proposed school. Legislation concerning charter schools predated Public Act 97-290. However, that Act amended the law governing the establishment and operation of charter schools to require the consideration of the reduction of racial, ethnic and economic isolation as a factor in approving new State or local charter schools or in renewing the charters of existing schools.[4] This change in the requirements for charter schools has already had an impact. The five charter CT Page 2909 school proposals submitted after the amendment did propose a student composition which would be diverse. As of the date of the hearing before this court the Legislature was considering legislation which would require the applicants to demonstrate that the proposed school will reduce racial, ethnic and economic isolation.
In addition to changing the substantive requirements of charter school approval to reduce racial and ethnic isolation, the State has increased charter school funding significantly.[5] Six million dollars has been allocated for 1997-98 and nine million for 1998-99, with a concomitant increase in the number of authorized seats.
Minority Staff Recruitment
Section two of Public Act 97-290 also listed minority staff recruitment as one method whereby schools could attempt to alleviate racial, ethnic and economic isolation. There is no dispute that increasing the diversity of school staff and administrators, including minority representation in teacher preparation programs, can play a role in the reduction of racial and ethnic isolation. Under Connecticut General Statutes §10-220, as amended by P.A. 98-252 § 13, each local or regional board of education must now develop and implement a written plan for minority staff recruitment, along with reporting requirements. In addition, legislation in 1998 added additional funds to the Connecticut State Universities and the University of Connecticut for scholarships for future minority educators.[6]
The Regional Educational Service Centers gather data on minority staff recruitment and coordinate meetings and recruiting fairs which concern the recruitment of minority staff.
At the hearing Theodore Sergi, Connecticut's Education Commissioner, testified that the State Department of Education had conducted a survey in February of 1998 to determine whether local school boards had made efforts in the area of minority recruitment. It found that the vast majority of school districts were attempting to recruit minority teachers and half of the districts had a written policy regarding minority recruitment.
Commissioner Sergi described an incident concerning public statements made by the former school superintendent in Cheshire on the issue of minority recruitment. The Commissioner received a letter from Representative Cameron Staples, co-chairman of the CT Page 2910 House education committee, which letter expressed concern about the superintendent's statements. In response, Commissioner Sergi made a personal visit to the Cheshire Board of Education where he obtained assurances that Cheshire in fact intended to abide by its legal duties with regard to minority recruitment. Thereafter Cheshire offered a substantial number of spaces for participation in the Choice program.
The Choice Program Section three of Public Act 97-290 provides, in pertinent part:
 (b) There is established, within available appropriations, a state-wide interdistrict public school attendance program. The purpose of the program shall be to: (1) Improve academic achievement; (2) reduce racial, ethnic and economic isolation or preserve racial and ethnic balance; and (3) provide a choice of educational programs for students.
 (c) The program shall be phased in as provided in this subsection. (1) For the fiscal year ending June 30, 1998, the Department of Education shall provide grants in the amount of fifty thousand dollars each to the regional educational service centers for the Hartford, New Haven and Bridgeport regions to assist school districts in planning for the operation of the program. (2) For the school year commencing in 1998, and for each school year thereafter, the program shall be in operation in the Hartford, New Haven and Bridgeport regions. Students who reside in Hartford, New Haven or Bridgeport may attend school in another school district in the region and students who reside in such other school districts may attend school in Hartford, New Haven or Bridgeport. The Department of Education shall provide, within available appropriations, a grant for the fiscal year ending June 30, 1999, to the remaining regional educational service centers to assist school districts in planning for the expansion of the program to every school district in the state. (3) For the school year commencing in 1999, and for each school year thereafter, the program shall be in operation in every school district in the state and students may attend school in any school district in accordance with the provisions of this section, including the purposes specified in subsection (b) of this section.
CT Page 2911
The Choice program, or "Open Choice" as it is sometimes called, is an outgrowth of the Project Concern program, which operated for many years in the Hartford area, and which, in its early history, also operated in the New Haven and Bridgeport areas.
Under the new Choice program, beginning first in Hartford, New Haven and Bridgeport areas, and then later throughout the state, districts must report to their respective Regional Education Service Centers seats available for students from other districts to allow interdistrict attendance. Project Concern, which operated in the Hartford area until this school year, has been folded into this program.[7] Three million dollars has been allocated for the Choice Program for the 1998-1999 school year alone, as compared to just $900,000 for Project Concern in the year before the Supreme Court's decision in this case. Commissioner Sergi expects that the program will grow in the future.
The Choice Program includes features which were not present in its predecessor, Project Concern. Project Concern was not available to all students in Hartford. Only the parents of particular children were "invited" to apply. Under Choice, all students are free to apply, and unlike Project Concern, special education students and students with limited English Proficiency are not turned away. The Latino participation rate in Choice has already exceeded the "best" years of Project Concern.
If a Choice program student needs special education, the receiving district must provide the services and if the cost of the services exceeds the $2000 per student the district receives from the State, the sending district picks up that extra cost. The student is also the responsibility of the receiving district for all disciplinary purposes.
By providing the receiving district with $2000 per student and the one half of the "daily membership" for Educational Cost Sharing purposes, the Legislature sought to shift the financial burden and the responsibility for the student to the receiving district, without the "umbilical cord back to Hartford" that existed under Project Concern. Already, in its first year, the Choice program has achieved more Latino student participation in the Hartford area than Project Concern achieved in even its peak years. Other improvements over the old program include the renewed participation of the New Haven and Bridgeport regions, CT Page 2912 and an expected increase in total number of students in the programs. Under Project Concern, the State paid only $468 per student to the receiving district. Under the Choice program, the State pays $2000 per student and also provides a $1200 per student transportation grant to the appropriate Regional Education Service Center. Finally, under the Choice program, once the receiving district has committed to taking a student, it is by law obligated to keep the student in its system at least until the student graduates from the particular school building to which he or she has been admitted.
The 1998-99 School year is the first year for the operation of the Choice Program. Suburban school districts made 1400 seats available statewide. The commitment of this many seats in the first year of the program was particularly encouraging because many suburban districts have a strained capacity due to increases in student populations and the increasing number of special education students who are taught in mainstream classrooms.
The State is providing several incentives to encourage local districts to offer seats in the Choice program. Any school district which builds a school facility which includes extra room for the interdistrict transfer of students will receive funds from the State in an amount which is ten percent higher than the district's normal reimbursement rate.[8] Another incentive for districts to offer seats in the program is the districts' new statutory duty to demonstrate evidence of progress in reducing isolation.
Lighthouse Schools
The inclusion of a provision concerning lighthouse schools inPublic Act 97-290 (§ 18) resulted from legislative debate, rather than from the recommendations of the Education Improvement Panel. The concept of the lighthouse school came about as a result of a number of legislators describing the need to enable educators to improve the quality of a school in a district to the degree that it would attract students from across the district, and, eventually, from other school districts. A lighthouse school can be the predecessor of an interdistrict magnet school. There are several schools in New Haven which were open only to children from New Haven until parents prevailed upon the school board to open them to children from other districts. Those schools began as, essentially, New Haven lighthouse schools and became interdistrict magnet schools. For the school year 1998-99 there CT Page 2913 are approximately 500 children from outside New Haven who will attend New Haven schools.
Under Public Act 97-290 § 18 one hundred thousand dollars per year is designated to fund planning of lighthouse school programs initially in Hartford, and later including Bridgeport and New Haven. The Hartford program could open as early as next year. The two Hartford school principals who testified as witnesses for the plaintiffs endorsed the efficacy of such programs. Mr. Thompson testified about his intention to develop a lighthouse school based on his school's highly successful intradistrict classical magnet program. He further stated that he believed that such a high quality program could attract students from the suburbs. Mr. Montanez testified that he and his staff at the Mary Hooker Elementary School in Hartford have been working on a lighthouse school curriculum for several years and he expects that it will take several more years before his curriculum is ready to be implemented.
Time Frames Specified in Public Act 97-290
Section four of Public Act 97-290 requires the State Board of Education to develop a five-year implementation plan "with appropriate goals and strategies to achieve resource equity and equality of opportunity, increase student achievement, reduce racial, ethnic and economic isolation, improve effective instruction and encourage greater parental and community involvement in all public schools of the state." That section also requires that the implementation plan shall:
 (1) Include methods for significantly reducing over a five-year period any disparities among school districts in terms of resources, staff, programs and curriculum, student achievement and community involvement that negatively impact student learning, (2) provide for monitoring by the Department of Education of the progress made in reducing such disparities, and (3) include proposals for minority staff recruitment, including but not limited to, alternative certification, mentoring programs, involvement of the community-technical colleges and efforts by regional educational service centers.
In accordance with that section, the State Department of Education completed a thorough analysis of resource disparities among Connecticut school districts in February, 1998. The purpose CT Page 2914 of that analysis was to provide a clear understanding of where the greatest disparities existed among Connecticut's public schools in order to focus efforts to reduce such disparities. This February 1998 report also contained specific further legislative recommendations, which were adopted by the General Assembly. An assessment of disparities in programs and curricula, student achievement, and the reduction of racial, ethnic and economic isolation, and of the improvement of parental and community involvement, with further legislative recommendations, was due in January, 1999. The State Department of Education was on schedule for meeting this legislated time frame at the time of the hearing. To date, activities on meeting the second part of this legislative mandate have involved more interactions with the school superintendents and the consideration of further proposals regarding magnet schools, charter schools and the Open Choice program. The State Department of Education has an ongoing duty to analyze and report educational disparities on a biennial basis after January, 1999.
Reporting on Efforts to Reduce Isolation Public Act 97-290 § 2 required all local and regional boards of education to report by October 1, 1998, and biennially thereafter to their respective Regional Education Service Centers, their efforts at reducing racial, ethnic and economic isolation. The State Department of Education will assess their "progress over time" in achieving such reduction. The regional centers will in turn report to the Commissioner, who will report by January 1, 1999 and biennially thereafter to the Governor and legislature. Once this year's "baseline" or "benchmark" has been established for each school district, the district will be required to demonstrate "evidence of progress over time" on reducing racial, ethnic and economic isolation.
This legislatively mandated duty to demonstrate reduction in isolation in each district's schools has put the districts on notice that they are required to participate in interdistrict programs in meaningful ways, and is one of the reasons for the increased interest in interdistrict programs. If local school districts fail to demonstrate evidence of progress in reducing racial and ethnic isolation, they can be subjected to financial sanctions or court ordered implementation of a plan to reduce racial and ethnic isolation. See Connecticut General Statutes § 10-4b. CT Page 2915
State's Takeover of the Hartford Public Schools
In February of 1996 before the Supreme Court's decision in this case, the Hartford Board of Education voted to sever its relationship with Education Alternatives, Inc., a private company that had been contracted with to manage and run the Hartford schools. After the Hartford City Council declared a state of emergency the Mayor and the chair of the Hartford Board of Education asked the State Department of Education to conduct a comprehensive assessment of the Hartford Public Schools. That assessment included an examination of existing curriculum, the growth and prevalence of special education, and staffing and facilities. The New England Regional Laboratory at Brown University conducted interview polling of 200 parents, students, teachers and community members. The assessment produced 48 recommendations which were subsequently adopted by the Hartford Board of Education. Although Hartford teachers and staff appeared to take the recommendations to heart and began to address them, the Hartford Board of Education was beset by such discord that it could not take any effective action with respect to the Hartford Public Schools. The situation continued to decline into early 1997.
Thereafter the General Assembly passed Special Act 97-4, which eliminated the Hartford Board of Education and replaced it with the State Board of Trustees as the governing body of the Hartford Public Schools. That special act adopted the 48 recommendations. The State Department of Education assigned monitors to verify Hartford's progress in implementing those recommendations and the mandates of the Act and to prepare quarterly progress reports for the Trustees.
Even the Board of Trustees' assumption of control did not end Hartford's problems. The Board of Trustees determined that Hartford needed a new Superintendent of Schools. At the time of the hearing a capable acting superintendent and assistant superintendent for finance were in place in Hartford.
Commissioner Sergi testified that the mechanisms for long term improvement in Hartford Schools are in place, and the issue now is "execution, not vision." There has been unprecedented cooperation between the State and the City, according to the Commissioner, with a significant increase in State and Federal resources coming into the district. Once Hartford was no longer paralyzed by an ineffectual Board of Education, major work on the CT Page 2916 facilities infrastructure and curriculum began. In Hartford achievement in the elementary schools has improved in each of the last five years. The special education prevalence rate has been reduced and attendance has improved.
Commissioner Sergi further testified that a "culture of accepting a light bulb that's out, a child who can't read, a roof that leaks" is changing albeit with some "bumps in the road."
Improvement of the Quality of Urban Education
Curiously, at the hearing before this court the plaintiffs counsel repeatedly objected to and labeled irrelevant evidence of the numerous efforts and initiatives aimed at improving the quality of urban education. However plaintiffs' witnesses acknowledged the crucial link between improving urban education and reducing racial isolation for all students.
Mr. James Thompson, principal of Simpson-Waverly Elementary School in Hartford, testified that following the forty-eight recommendations to improve the Hartford schools will bring about positive results, which will in turn play a role in bringing suburban students into the schools. Mr. Allison, another witness called by the plaintiffs, stated that improving the quality of education in Hartford is "critical," and Dr. Natriello, one of the plaintiffs' expert witnesses, testified that it was appropriate for educational leaders to seek to improve urban education at the same time they seek to reduce isolation because there is a relationship between the two — higher quality attracts more students. Another plaintiffs' expert witness, Dr. Gordon, testified that if there is a quality program at the end of the bus ride in Hartford, people will support it. He also opined that the majority of successful desegregation plans succeed because they improve the quality of schooling that was present in the minority schools before the plan.
The following describes steps which the State has taken to improve the quality of urban education statewide.
The Legislature has enacted a well funded program to improve school readiness for preschoolers by establishing local school readiness councils and targeting urban and priority districts.See Public Act 97-259, as amended by P.A. 97-11 (June 18 Special Session) § 25, P.A. 98-239 § 30; P.A. 98-243 §§ 10, 11, and P.A. 98-252 § 32; S.A. 97-21. School readiness CT Page 2917 programs were added to the existing network of family resources centers to assist students. The school readiness councils which will be set up throughout the State will apportion the monies, with 85-90% set aside for "priority" school districts. Sixty such program centers are planned for 1998-1999. See Connecticut General Statutes § 10-4o, as amended by P.A. 97-259 § 21. The Head Start program has received increased funding. See
Connecticut General Statutes § 10-16n, as amended byP.A. 97-247 § 7, S.A. 97-21. In total, funding for these programs has increased from $2 million in 1996-97, to $24 million in 1997-98, to $46 million in 1998-99.
Each local and regional board of education must now develop plans for improving early reading skills, SeePublic Act 98-243 § 1, and the State Board of Education has adopted specific reading standards. See Public Act 97-290 § 23, as amended by P.S. 98-243 § 2. Districts must also now provide annual reports on the condition of their facilities, which the Commissioner will use to report to the General Assembly. See Connecticut General Statutes § 10-220, as amended byPublic Act 97-290 § 21. The first comprehensive data collection on the condition of school facilities in Connecticut has now been completed, and that database will be updated regularly.
Legislation passed in 1997 and 1998 increased funding for the State Department of Education's long-standing programs to assist "urban and priority districts" through targeted grants with an emphasis on achieving more early reading success. Sixteen million dollars were allocated for this purpose in 1996-97, $18 million in 1997-98 and $19 million in 1998-99. The State has added a "transitional" school district grant. Commissioner Sergi testified that the purpose of such grants was to "reach communities in the first ring suburbs and some of our older cities" traditionally left out of the funding under the priority school district scheme. Twenty percent of all priority school district grants must go to early reading activities.
Twenty-five million dollars in technology infrastructure grants have been created over the last three school years for the wiring of schools for internet access, with a substantial portion earmarked for Hartford, New Haven, Bridgeport, and Waterbury. Connecticut General Statutes § 10-4h, as amended byPublic Act 98-252 § 5; Special Act 97-1 (June 5 Special Session) §§ 13, 32, as amended by S.A. 98-9 § 77. CT Page 2918
The State Department of Education has distributed a model plan to all districts for encouraging parental and community involvement in the schools, and districts must now develop their own such policies and procedures. Section 21 of Public Act 97-290
requires school districts to provide annual reports on the condition of their facilities. The first comprehensive data collection on the condition of school facilities in Connecticut has been complete and that data base will be updated regularly.
At the time of the hearing before this court, the State had increased its total funding of education, including substantial funding specifically directed to reduce racial, ethnic and economic isolation, by $200 million above its funding for education before the decision of the Supreme Court in this case. For the 1998-99 school year alone, the State increased its funding for education by $93 million.
Has the State Complied with the Supreme Court's Order In the "Remedies" section of its opinion in this case the Supreme Court stated:
 Because the parties have not had the opportunity to present evidence directed to the remedial consequences that follow from our decision on the merits of the plaintiffs' complaint, we could remand this case to the trial court for further proceedings to address remedies. Alternatively, if no further evidentiary inquiries would be required, we could invite further briefing in this court and attempt to resolve the issues ourselves.
We have decided not to follow either of these avenues but to employ the methodology used in Horton I. In that case, the trial court, after having found for the plaintiffs, limited its judgment by granting only declaratory relief but retained jurisdiction to grant consequential relief, if needed, at some future time. Horton I, supra. 172 Conn. 650. In light of the complexities of developing a legislative program that would respond to the constitutional deprivation that the plaintiffs had established, we concluded, in Horton I, that further judicial intervention should be stayed "to afford the General Assembly an opportunity to take appropriate legislative action." Id., 653. Prudence and sensitivity to the constitutional authority of coordinate branches of government counsel the same caution in this case. CT Page 2919
 In staying our hand, we do not wish to be misunderstood about the urgency of finding an appropriate remedy for the plight of Hartford's public schoolchildren. Every passing day denies these children their constitutional right to a substantially equal educational opportunity. Every passing day shortchanges these children in their ability to learn to contribute to their own well-being and to that of this state and nation. We direct the legislature and the executive branch to put the search for appropriate remedial measures at the top of their respective agendas. We are confident that with energy and good will, appropriate remedies can be found and implemented in time to make a difference before another generation of children suffers the consequences of a segregated public school education.
238 Conn. at 45-46.
The plaintiffs do not claim that the legislative and executive branches took no action in response to the Supreme Court's directive. Rather, they claim that the State has not done enough fast enough. In support of this contention they rely on the undisputed fact that at the time they returned to court, March, 1998, and at the time of the hearing, September, 1998, the racial imbalance in the Hartford schools had not only not improved, but had become slightly worse than it was at the time the Supreme Court issued its decision in this case.
Certainly one method of assessing the efficacy of the State's efforts to reduce racial and ethnic isolation in the Hartford schools is to wait a reasonable amount of time to see how many students in Hartford are still attending schools in which they are racially or ethnically isolated. For the reasons set forth below, the court finds that the plaintiffs failed to wait a reasonable time and that their return to court was premature. They have returned to court well before any reasonable efforts could possibly have had any discernible effects.
The Supreme Court issued its decision on July 9, 1996. Even if the Executive and Legislative Branches had been able to pass remedial legislation on the very next day that would have come too late to affect the 1996-1997 school year. Programs for that year would have to have been completed by approximately March, 1996. Therefore, even an instantaneous State response could not have been reasonably implemented until the 1997-98 school year. CT Page 2920 The plaintiffs did not even wait until the end of that first school year before determining that the State's actions were inadequate, but instead first sought relief from this court in March of 1998.
The Executive and Legislative Branches of this state both acted very expeditiously to comply with the Supreme Court's order. Governor Rowland issued the Executive Order which created the Education Improvement Panel just sixteen days after the Supreme Court's decision issued. In the following six month period Governor Rowland and the Legislative leadership appointed twenty-one citizens to the Panel. Those citizens devoted many days in discussion, deliberations and information gathering and issued the final report of the Panel on January 22, 1997. Within five months after it received that report the Connecticut Legislature passed Public Act 97-290. Notwithstanding the speed with which the Legislature acted to pass that legislation, the legislation was not cursory, but rather, was a comprehensive, carefully drafted, and well funded plan.
Most of the measures enacted under Public Act 97-290 had not even gone into effect in March, 1998 when the plaintiffs returned to court. The first year of Project Choice was 1998-99. The school districts were to complete their first report on their efforts at reducing racial, ethnic and economic isolation by October 1, 1998. This was to serve as a "baseline" by which to gauge progress in succeeding years.
The plaintiffs have not disputed that the Hartford School Board experienced problems that ultimately became insurmountable after the Supreme Court's decision. It was unreasonable for the plaintiffs to expect that reforms of any kind could have been implemented in Hartford before the State 1) took control of the management of Hartford Schools and 2) stabilized basic problems with the physical school facilities. That stabilization process was ongoing when the plaintiffs first returned to court and even at the time of the hearing.
The plaintiffs do not disagree with the measures the State has taken in its attempt to reduce racial and ethnic isolation in Hartford. On the contrary, almost every witness called by the plaintiffs was in favor of some or all of those measures.
Professor Natriello agreed that it is beneficial to try and build community support for interdistrict programs and magnets in CT Page 2921 order to have a greater chance of long term success. He further agreed, as did Dr. William Gordon, that reducing ethnic-racial isolation and improving quality of education go hand-in-hand because it is easier to attract diverse students to good schools. Dr. Gordon endorsed the State's policy of developing grass-roots support for desegregation plans. He also agreed that financial incentives can play a role in participation of districts in interdistrict magnets, that promoting increased diversity in school staff helps to reduce isolation, that the use of interdistrict magnets was an acceptable method of reducing racial isolation and that he was in favor of the State encouraging the building of new buildings closer to the border with Hartford. Finally, Dr. Gordon stated that after reviewing the EIP report, he thought that its recommendations on increasing intra and interdistrict choice was a "concrete recommendation."
Dr. Gary Orfield endorsed the use of interdistrict magnet schools. He also testified in glowing terms about success of the so-called METCO program, which began in Boston in the 1960's and now has 3200 of Boston's total school population, which he did not quantify, participating in a voluntary school choice program. The METCO program sounded virtually identical to the Choice program mandated in P.A. 97-290.
Thus, the plaintiffs do not disagree that many of the measures adopted by the State can reduce racial and ethnic isolation, but they argue that the State has not acted fast enough in complying with the Supreme Court's decision.
The Supreme Court did not specify a time frame for the reduction of racial and ethnic isolation. It used the word "urgent" at the same time it ordered the legislative and executive branches to take action. The Court was certainly aware that the legislative process is not an instantaneous one and that before any reduction in racial, ethnic or economic isolation could occur, the executive and legislative branches needed sufficient time to propose and enact meaningful legislation. Therefore, the word "urgent" cannot reasonably be construed to require instantaneous action.
In order to determine the efficacy as well as the timeliness of the State's response to the Supreme Court's decision, it is necessary to consider the alternative remedies available to the State in its attempts to reduce racial, ethnic and economic isolation in Hartford schools. The remedies fall into two basic CT Page 2922 categories: voluntary and mandatory.
The measures mandated by Public Act 97-290 and the other legislation referred to above are voluntary. As previously stated, the plaintiffs do not oppose voluntary measures in general. However, those measures do not produce the quick results that the plaintiffs seek. In addition, Dr. Gordon faulted the voluntary measures adopted by the State largely because those measures contained no quotas or other numerical goals. He testified that unless a desegregation plan had quotas, it was not really a desegregation plan.
Commissioner Sergi testified that the State purposely refrained from adopting arbitrary quotas or numerical goals, but rather, expects school districts to show continual evidence of progress over time. He drew an analogy to the education funding cases, Horton v. Meskill, 195 Conn. 24, 486 A.2d (1985); Hortonv. Meskill, 187 Conn. 187, 445 A.2d 579 (1982); Horton v.Meskill, 172 Conn. 615, 376 A.2d 359 (1977), stating that numerical goals were not established there as measures of progress. Instead, the State adopted the broad goals of reducing the disparity in communities' ability to pay for education and reducing the disparity in expenditures. Commissioner Sergi further testified that maintaining the broad goal of reducing racial isolation with the broad measure of progress over time provides flexibility.
Dr. Orfield opined that the State had not created enough magnet schools and further testified that the State could open a sufficient number of new magnet schools by the school year 1999-00 "to move from a situation where you had a few hundred students experiencing some kind of desegregated experience to a situation where you'd have several thousand students experiencing that very feasiblely by next year." Dr. Orfield ventured the foregoing opinion based on the assumption that there were buildings which were available and ready to house additional magnet schools. However, he had done no investigation and had no knowledge as to the availability of any school buildings. He admitted that if his proposed magnet schools required the construction of school buildings, then those magnets could not be completed within the time frame he suggested.
Dr. Orfield's testimony further made clear that there are no easy solutions in the difficult area of school desegregation. He testified that St. Louis and San Francisco, two cities where he CT Page 2923 had helped to create desegregation plans, had "failed to achieve metropolitan desegregation by any stretch of the imagination."
The second type of desegregation remedy is mandatory. Dr. Orfield testified that in order to fully desegregate the City of Hartford there would have to be significant mandatory reassignment of students. The term "mandatory reassignment" is, essentially, a synonym for "forced bussing."
Dr. Christine Rossell, an expert witness called by the defendants, presented convincing testimony that mandatory reassignment would not have the effect sought by the plaintiffs, and would in fact, be counter productive. Unlike Dr. Orfield, whose testimony was not based on any statistical research. Dr. Rossell has conducted extensive empirical studies of the effects of various types of desegregation plans. Stating that she previously had been a proponent of mandatory reassignment, she testified that her views changed when her empirical studies began to indicate that mandatory reassignment of white students to minority schools did, in fact, produce significant white enrollment loss or "white flight" from those schools.
Dr. Rossell testified that mandatory reassignment plans are only mandatory for the poorest people in a school district: "Everybody else has a choice. Poor people have to go where they're reassigned by some Court or Government agency who says you must go there. The rest of us can put our kids in private schools. We can move to another school district and we do. So even though these plans were implemented with the best of intentions and you have to understand that I supported them in the early years. Even though they were implemented with the best of intentions, the problem is they're mandatory only for the poorest people in a school district."
Dr. Rossell testified that the State's approach is to implement a state-wide remedy that is based on the premise that voluntary integration is more likely to produce a lasting integration and will have more positive social effects and that this will be enhanced by their equal emphasis on improving educational quality for all children. Her research shows that a voluntary approach to school desegregation is the most effective approach and it will produce the most lasting integration. In other words, according to Dr. Rossell, in the area of school desegregation slow and steady wins the race. CT Page 2924
In light of Dr. Rossell's findings about the relationship between mandatory reassignment of students and white flight it is not surprising to learn that since 1981 only two small school districts, Hattiesburg and Natchez, have adopted desegregation plans which use mandatary reassignment. In those districts mandatory reassignment produced a rate of white enrollment loss of about 45%. Dr. Rossell predicted that if white suburban students were mandatorily reassigned to Hartford that Hartford schools would experience a white enrollment loss at approximately the rate of 45 — 50%.
Many federal courts have held that white flight, or white enrollment loss, may be taken into account in an attempt to promote integration. Clark v. Board of Education,705 F.2d 265, 271 (8th Cir. 1983); Stout v. Jefferson CountyBoard of Education, 537 F.2d 800, 802 (5th Cir 1976); ParentAss'n of Andrew Jackson High School v. Ambach, 598 F.2d 705 719
(2d Cir. 1979).
The plaintiffs' comparison of the State's efforts to reduce racial and ethnic isolation with the conduct of the states and cities involved in the cases of Swann v. Charlotte-MecklenburgBoard of Education; 402 U.S. 1 (1971); Milliken v. Bradley,433 U.S. 267 (1977); and Green v. County School Board, 391 U.S. 430
(1968), is hardly appropriate. In those cases the United States Supreme Court addressed blatant de jure segregation which had continued unabated for years after its decision in Brown v. Boardof Education, 347 U.S. 483 (1954) (in the field of public education the doctrine of "separate but equal" has no place. Separate educational facilities are inherently unequal.)
In Swann the North Carolina General Assembly responded toBrown by passing the Pupil Assignment Act (1955-56), which allowed school boards to continue to assign pupils to separate schools based on race. Seventeen years after the Brown decision prohibited the practice of maintaining separate schools for black and white children, the Supreme Court found that the local school board had taken affirmative measures which had "been used as a potent weapon for creating or maintaining a state-segregated school system." 402 U.S. at 21.
Similarly, in Green the Court also addressed blatant de jure
segregation:
Petitioners brought this action in March 1965 seeking CT Page 2925 injunctive relief against respondent's continued maintenance of an alleged racially segregated school system. New Kent County is a rural county in Eastern Virginia. About one-half of its population of some 4,500 are Negroes. There is no residential segregation in the county; persons of both races reside throughout. The school system has only two schools,
the New Kent school on the east side of the county and the George W. Watkins school on the west side. In a memorandum filed May 17, 1966, the District Court found that the "school system serves approximately 1,300 pupils, of which 740 are Negro and 550 are White. The School Board operates one white combined elementary and high school [New Kent], and one Negro combined elementary and high school [George W. Watkins]. There are no attendance zones. Each school serves the entire county." The record indicates that 21 school buses — 11 serving the Watkins school and 10 serving the New Kent school — travel overlapping routes throughout the county to transport pupils to and from the two schools.
 The segregated system was initially established and maintained under the compulsion of Virginia constitutional and statutory provisions mandating racial segregation in public education, Va. Const., Art. IX, § 140 (1902); Va. Code § 22-221 (1950). These provisions were held to violate the Federal Constitution in Davis v. County School Board of Prince Edward County, decided with Brown v. Board of Education, 347 U.S. 483, 487 (Brown I). The respondent School Board continued the segregated operation of the system after the Brown decisions, presumably on the authority of several statutes enacted by Virginia in resistance to those decisions.
391 U.S. 432-33. (Emphasis added)
In its decision in this case the Supreme Court acknowledged that the racial segregation in the
Hartford schools was de facto, not de jure:
The state has not intentionally segregated racial and ethnic minorities in the Hartford public school system. Except for a brief period in 1868, no students in Connecticut have intentionally been assigned to a public school or to a public school district on the basis of race or ethnicity. There has never been any other manifestation of de jure segregation CT Page 2926 either at the state or the local level. In addition to various civil.
238 Conn. at 10.
The measures appropriate to remedy de jure segregation which has continued for more than ten years in violation of a United States Supreme Court decision must necessarily be more severe than those appropriate to address de facto segregation which has continued for only several years after it was held to violate the Connecticut Constitution. See Swann v. Charlotte-MecklenburgBoard of Education, 402 U.S. at 16 (the nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation). It is further inappropriate for the plaintiffs to draw an analogy to the remedies employed inSwann, Green and Milliken because under federal law the plaintiffs would have no remedy in this case. Federal law does not remedy de facto segregation. Sheff v. O'Neill,238 Conn. at 3; Pasadena Bd. of Education v. Spangler, 427 U.S. 424,434-36(1976).
The rapid rate of desegregation which the plaintiffs seek can only be accomplished through a mandatory reassignment plan. Based on the evidence presented at the hearing this court finds that voluntary plans are generally superior to mandatory ones because they promote integration of more lasting duration with a minimum of opposition and disruption. This has been recognized by courts in other jurisdictions:
 A key to the success of the [Buffalo desegregation] plan is the fact that for the most part, the integration of the schools has been achieved by voluntary means. Through the use of innovative educational techniques, the need for fixed assignments and mandatory busing of students has been kept to a minimum. There has been no disruption of the schools, no violence, and no massive "white flight" of majority students from the City. Instead, the City schools have improved through the use of these [voluntary] programs, and the proportion of majority to minority students has remained steady, even as the population of the City has decreased.
Arthur v. Nyquist, 547 F. Sup. 468, 470 (W.D.N.Y. 1982).
Voluntary integration plans make particular sense in situations where, as here, the past segregation was defacto and CT Page 2927 not dejure. A Pennsylvania court approved a school district's voluntary plan as a response to a finding of de facto segregation over the objections of the plaintiffs, who wanted a plan with mandatory components. The court concluded that, because "the School District of Philadelphia became segregated by action of the people on a voluntary basis by their selection of their neighborhood residence, [i]t does not seem inappropriate to attempt to achieve desegregation by the equally voluntary action of the people in the selection of the schools their children will attend." Pennsylvania Human Relations Commission. School districtof Philadelphia, 374 A.2d 1014, 1016 (Pa.Cmnwlth. 1977), aff'd,390 A.2d 1238 (1978).
Representative Cameron Staples, Chairman of the Education Committee stated that Public Act 97-290 does not represent "all that we are capable of doing to address the inequities in our school system and the racial isolation in our school system. But I think it is a very important first step and I think more importantly than anything else, it sets in motion a second step, a third step, and a five year step to make sure that this issue is at the front of our agenda for the next five years." 40 H.R. Proc., Pt. 17, 1997 Sess., pp. 6181-82.
The plaintiffs have sought court intervention before the State has had an opportunity to take even a "second step" in the remedial process. The State has acted expeditiously and in good faith to respond to the decision of the Supreme Court in this case. It has devised a comprehensive, interrelated, well funded set of programs and legislation designed to improve education for all children, with a special emphasis on urban children, while promoting diverse educational environments. The Legislative and Executive branches should have a realistic opportunity to implement their remedial programs before further court intervention. This will not only satisfy the Supreme Court's desire to be sensitive to the "constitutional authority of coordinate branches of government," 238 Conn. at 45-46, but will also allow any educational reform plan to gain grassroots popular support which is crucial to the success of any plan. The best way to achieve popular support is not to impose a judicially mandated remedial plan, but to encourage Connecticut's populace as a whole, both directly and through their elected representatives, to solve the problems facing the state's schools.
For the reasons set forth above this court finds that the State has complied with the Decision of the Supreme Court in this CT Page 2928 case.
By the court, Aurigemma, J.